SELENA P. HUTCHINSON,

   **Plaintiff,**

     **v.**          Civil Action No.  09-00718 (JEB)

ERIC HOLDER,

   **Defendant.**

## MEMORANDUM OPINION

   Plaintiff Selena Hutchinson is a black female employed by the Federal Bureau of Investigation.  She claims that the FBI took several discrete employment actions that constituted discrimination and retaliation.  She also alleges that the FBI subjected her to a hostile work environment.  Several of her discrete discrimination and retaliation claims were previously dismissed by the Court or have since been withdrawn.  Defendant has now filed a Motion for Summary Judgment with respect to what remains.  Because no reasonable jury could find that Plaintiff suffered an adverse employment action with regard to one of her discrete claims, that Defendant's stated reasons for its other employment decisions were pretextual, or that Plaintiff was subjected to a hostile work environment, the Court will grant Defendant's Motion.

**I.**   **Background**

   Plaintiff has been employed by the FBI since March 25, 1990.  Compl., ¶ 14.  She worked in an IT unit that was part of the Foreign Terrorist Tracking Task Force (FTTTF), a stand-alone entity with its own IT support unit, in the Counterterrorism Division (CTD) of the FBI.  See Mot., Exh. 1 (Pl.'s Dep.) at 33-36; Def.'s Stat. Undis. Mat. Facts (SUMF), ¶ 2.  She was initially hired as a GS-13 Computer Equipment Analyst, was promoted to the GS-14 level in

1991, and then moved to the GS-15 level in 1995. Compl., ¶¶ 14-15. FBI records showed that her official title at the GS-15 level remained "Computer Scientist" throughout the time period in issue. <u>See</u> Pl.'s Dep. at 26; Reply, Exh. 6 (Personnel Action History, Selena P. Hutchinson). Beginning in 2003, however, Plaintiff was informed by her supervisor, Mark Tanner, that she held a Unit Chief position; she also performed the duties usually associated with that role and was widely regarded to have held that position. <u>See</u> Opp., Exh. 5 (Aff. of Mark Tanner) at 3-4; <u>id.</u>, Exh. 18 (Dep. of Jerome Duiguid) at 17-18; <u>id.</u>, Exh. 30 (Aff. of Craig Kelly) at 3; <u>id.</u>, Exh. 14 (Tanner Documents), *passim*; <u>id.</u>, Exh. 10 (Dep. of James Loudermilk) at 38-39; <u>id.</u>, Exh. 3 (Dep. of Thomas Harrington) at 21-22; Def.'s SUMF, ¶ 3.

     Upon Tanner's retirement in 2005, Chief Technology Officer Jerome Israel briefly became Plaintiff's supervisor. Compl., ¶ 18. In September 2005, Israel hired Timothy Goodwin as a Unit Chief. Def.'s SUMF, ¶ 1; Israel Dep. at 32, 35. Two months later, the FBI implemented a reorganization in which the previously independent FTTTF IT unit in which Plaintiff worked was absorbed into the Office of the Chief Technology Officer (OCTO). <u>See</u> Pl.'s Dep. at 33-35; Def.'s SUMF, ¶ 6. Following the merger of the FTTTF's IT unit into OCTO, Goodwin was appointed to serve as Acting Section Chief over that unit. <u>See</u> Israel Dep. at 34-35, 41-42; Def.'s SUMF, ¶ 8. In early January, Plaintiff was informed that, as a result of this reorganization, Goodwin had become her direct supervisor. Compl., ¶ 21.

     Meanwhile, sometime in late 2005, Israel – who, after Goodwin's appointment to the Acting Chief position, was Plaintiff's "second-line supervisor" – began to question Plaintiff's status as a Unit Chief. <u>Id.</u>, ¶¶ 20-21. In response to Israel's inquiries, Tanner explained that he had appointed Plaintiff to a Unit Chief position and that she had been performing the duties associated with that role. <u>See</u> Tanner Aff. at 5; Tanner Documents, *passim*. On January 9, 2006,

Israel informed Plaintiff that she was not, in fact, a Unit Chief.  See Compl., ¶ 20.  Two days later, Goodwin provided Plaintiff with a new Performance Plan that indicated she no longer had supervisory responsibilities; he also informed two of Plaintiff's subordinate managers that she was no longer their supervisor and that they should report to him in the future.  Id., ¶¶ 22-23.  Plaintiff was also required to vacate her office.  Id., ¶ 24.  That same day, Plaintiff initiated informal contact with the FBI's Equal Employment Opportunity office.  Id., ¶ 25.

The voluminous record details the deterioration of Plaintiff's relationships with Israel and Goodwin in the months that followed.  On March 26, 2007, for example, Goodwin notified several individuals that he was removing Plaintiff from her role of Project Manager for two related projects called Guardian and e-Guardian.  See id., ¶ 40.  Plaintiff herself was notified three days later.  Id.  Plaintiff considered these to have been "the better known of the projects" she had been working on, Pl.'s Dep. at 51, and had received awards and commendations for her work on them.  See Compl., ¶¶ 16, 30.  After her removal from the projects, "she did not receive other assignments commensurate with her grade, skills, and knowledge, was not allowed to participate in decisionmaking, was not invited to meetings, and was not given any bona fide responsibilities or assigned duties."  Id., ¶ 42.

In 2007, an individual filed an anonymous complaint with the FBI's Office of Professional Responsibility, alleging Plaintiff had authored three letters of recommendation on FBI letterhead using the title "Unit Chief" or "Acting Section Chief" when she was not entitled to do so.  See Compl., ¶¶ 50-54, 63-64; Pl.'s Opp., Exh. 19 (OPR Documents), at 11-12. This complaint resulted in the initiation of an internal investigation of Plaintiff's conduct on April 13, 2007.  See OPR Documents at 1.  She admitted to having written the letters, but provided OPR with evidence that she had in fact been acting in those roles when she had sent the letters, and

Tanner confirmed Plaintiff's assertions. See Compl., ¶ 54; OPR Documents at 11-12. On June 20, 2007, Plaintiff received a letter stating the matter had been referred to the Adjudication Unit for an outcome determination. Compl., ¶ 64. She never received a final determination, but eventually learned that the investigation had been closed. Id. The Adjudication Unit ultimately determined that Hutchinson had not violated a provision of the FBI Offense Code that prohibits "unprofessional conduct," but that she had violated another provision of that Code when she wrote the three letters. See OPR Documents at 11-12. The recommended penalty was an oral reprimand, id., but Plaintiff does not recall having received such a reprimand. See Pl.'s Dep. at 161.

In July 2007, Goodwin was transferred to a different unit, leaving a vacant Unit Chief position. See Compl., ¶¶ 61-62, 70; Def.'s SUMF, ¶¶ 61-62. Plaintiff sent Israel an email indicating that she wished to be considered to replace Goodwin. See Compl., ¶ 62; Israel Dep. at 182-83. Israel responded that he "appreciate[d her] willingness to step up" and that he was "evaluating [his] options and [would] let [her] know." Compl., ¶ 62. Plaintiff heard nothing further about the vacancy until July 5, 2007, when she learned that Richard Chandler, a white male who had previously been a Unit Chief elsewhere, had been appointed to the position. Id., ¶¶ 62, 70; Israel Dep. at 179-84. The vacancy had been neither posted nor opened for competition. Compl., ¶ 70; Israel Dep. at 179, 183-84.

Plaintiff identifies numerous other incidents between 2006 and 2008 that she found objectionable. *Inter alia*, Plaintiff alleges that she received multiple unfavorable performance reviews and several emails she found "demeaning" and "hostile"; in addition, she was subjected to comments she considered "hostile and inappropriate." See Mot., Exh. V to Parker Decl. (Pl.'s Resp. to Def.'s First Set of Interrogatories) at 1-9. She was again moved from her office and

ultimately located "in unhealthy, undesirable seating space." Id. at 4. She alleges that she did

not receive awards she believed were merited, was treated differently from other employees at

the GS-15 level, and was not given promotions and opportunities she thought she deserved. See

id. at 1-9.

As previously mentioned, Plaintiff initially contacted the EEO office on January 11,

2006. Compl., ¶¶ 7, 25. An internal mediation took place on April 30, 2006, but it did not result

in the resolution of Plaintiff's complaint. Id. ¶ 26. She received a Notice of Right to File a

Discrimination Complaint on February 27, 2007, and filed a formal complaint against Defendant

on March 3. Id., ¶¶ 8-9. In February 2009, Plaintiff withdrew her request for a hearing and

requested that the case be remanded to the FBI for a Final Agency Decision. Id., ¶ 12. That

request was granted on March 2, 2009. Id.

She ultimately filed this suit in federal court on April 20, 2009. She claimed she had

been discriminated against on the basis of her race and sex, retaliated against for complaining

about the alleged discrimination, and subjected to a hostile work environment. Defendant

subsequently filed a partial Motion to Dismiss, and Judge Ellen Segal Huvelle, to whom this case

was previously assigned, dismissed certain of Plaintiff's individual discrimination and retaliation

claims on November 12, 2009. See Hutchinson v. Holder, 668 F. Supp. 2d 201 (D.D.C. 2009).

After discovery, Defendant has now moved for summary judgment on the remaining claims.[1]

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v.

---

[1] In considering Defendant's Motion for Summary Judgment, the Court has reviewed Defendant's Motion, Plaintiff's Opposition, and Defendant's Reply.

Powell, 433 F.2d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, Inc., 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." Taxpayers Watchdog, Inc., v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987).  When a motion for summary judgment is under consideration, "the evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [her] favor." Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor.  Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the nonmovant's evidence is

"merely colorable" or "not significantly probative," summary judgment may be granted. <u>Liberty Lobby, Inc.</u>, 477 U.S. at 249-50.

**III.     Analysis**

What currently remain in this case are four discrete claims of discrimination and/or retaliation and one of hostile work environment. More specifically, Plaintiff maintains that: 1) Defendant discriminated against her on the basis of race and sex "when it removed her from her position as Unit Chief and removed the vast majority of her duties" in January 2006, Opp. at 5; 2) Defendant discriminated and retaliated against her when "it removed Plaintiff's Program Manager responsibilities for Guardian and e-Guardian" in March 2007, <u>id.</u> at 9; 3) Defendant retaliated against her when an "anonymous individual filed a complaint against Plaintiff with the FBI's Inspection Division alleging that Plaintiff misused FBI letterhead and misrepresented herself by using the title Unit Chief or Acting Section Chief in three written documents" in April 2007, <u>id.</u> at 12; and 4) Defendant discriminated and retaliated against her when it "did not consider Plaintiff for the Unit Chief position" that became vacant in June 2007 and ultimately hired a white male. <u>Id.</u> at 14. Finally, she asserts that Defendant subjected her to a hostile work environment. The Court will first address each of the discrete claims and then tackle the issue of hostile work environment.

   A.   <u>Discrete Discrimination and Retaliation Claims</u>

Plaintiff contends that Defendant violated the anti-discrimination and -retaliation provisions of Title VII and Section 1981 with respect to four incidents. Title VII makes it unlawful for an employer to "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), or "because [she] has made a

charge . . . or participated in any manner in an investigation" of employment discrimination. 42 U.S.C. § 2000e-3(a). Section 1981 prohibits racial discrimination in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981.

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court established the familiar three-step "burden-shifting approach to employment discrimination claims in cases where the plaintiff lacks direct evidence of discrimination." Chappell-Johnson v. Powell, 440 F.3d 484, 487 (D.C. Cir. 2006). "[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, nondiscriminatory reason" for its employment decision, however, the Court need not consider whether Plaintiff has made out a *prima facie* case under McDonnell Douglas; rather, it deploys a simpler analysis:

> [I]n considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).

Though Brady itself concerned a Title VII discrimination claim, the streamlined framework it announced applies to actions under both Title VII and Section 1981, see McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 3-4 (D.C. Cir. 2010) (applying the McDonnell Douglas framework, as simplified by Brady, to § 1981 claims); Royall v. National Ass'n of Letter Carriers, AFL-CIO, 548 F.3d 137, 144 (D.C. Cir. 2008), and to both discrimination and retaliation claims. See Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (Brady "principles apply equally to retaliation claims"). The Court, therefore, will follow

Brady and its progeny in determining, with regard to each of the alleged incidents of discrimination and/or retaliation, first whether the Brady prerequisites – an adverse employment action and a nondiscriminatory explanation – have been satisfied, and then, if so, whether Plaintiff has produced sufficient evidence for a reasonable jury to find that Defendant's asserted reason was pretextual and that Defendant in fact discriminated or retaliated against her.

### 1. Discrimination in Demotion from Unit Chief Position and Stripping of Unit Chief Duties[2]

Plaintiff first contends that Defendant discriminated against her on the basis of race and sex when it "demoted Plaintiff . . . from her position as Unit Chief and removed the vast majority of her duties" in January 2006. Opp. at 5. "To establish an adverse personnel action in the absence of diminution of pay or benefits, plaintiff must show an action with 'materially adverse consequences affecting the terms, conditions, or privileges of employment.'" Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (quoting Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999)); see also Walker v. WMATA, 102 F. Supp. 2d 24, 29 (D.D.C. 2000) ("An employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." (citation omitted)).

While a demotion is certainly an adverse employment action, Defendant has provided undisputed evidence establishing that Plaintiff never officially held the title of "Unit Chief" in the first place. See, e.g., Pl.'s Dep. at 26; Decl. of Steven Parker, Exh. C (June 6, 2007 Email). Plaintiff herself acknowledges this fact. See Pl.'s Dep. at 26; Opp. at 6. She insists, however,

---

[2] In her Opposition, Plaintiff argues that "this claim cannot be dismissed on summary judgment" because, although "Defendant identifies this claim in its Motion," it "does not further address it or move to dismiss it." Pl.'s Opp. at 5, n.3. While Defendant in its Motion may not have identified the disputed claim in precisely the same words as Plaintiff, the Court recognizes that Plaintiff's allegations are numerous and that her specific allegations have been refined as the case has progressed. Compare Compl. with Opp. There is no reason not to accord Defendant the same latitude here, particularly where Plaintiff has had the opportunity to rebut Defendant's reasons.

that this was a mere technicality, and she provides substantial support for her position that her previous supervisor (Tanner) had considered her a Unit Chief and "verbally advised . . . her" that she held that position, Mot., Exh. Z to Parker Decl. (Douglas Factors), that she had been performing the duties associated with the Unit Chief position, and that she was widely regarded to have held that position. See Tanner Aff. at 3-4; Duiguid Dep. at 8-9; Kelly Aff. at 3; Tanner Documents, *passim*; Loudermilk Dep. at 38-39; Harrington Dep. at 21-22. Indeed, Defendant appears to concede as much. See Def.'s SUMF, ¶ 3 (stating that Tanner "had referred to her as a unit chief and [she] had performed unit chief responsibilities").

As a result, although Plaintiff may not have been techinically demoted from the Unit Chief position, she has provided sufficient evidence of the abrogation of her supervisory duties and other responsibilities to establish an adverse employment action for purposes of surviving summary judgment. It is well established that "reassignment with significantly different responsibilities" can comprise an adverse employment action. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Our Circuit has held more specifically that "withdrawing an employee's supervisory duties constitutes an adverse employment action." Stewart v. Ashcroft, 352 F.3d 422, 427 (D.C. Cir. 2003) (emphasis added); see also Burke v. Gould, 286 F.3d 513, 522 (D.C. Cir. 2002) ("[W]e have no doubt that the removal of [Plaintiff's] supervisory responsibilities constituted an adverse employment action."). Indeed, "a material reduction of supervisory responsibilities, no less than a total deprivation of such responsibilities, can amount to an adverse employment action." Ohal v. Board of Trustees of Univ. of Dist. of Columbia, 100 Fed. Appx. 833, 834 (D.C. Cir. 2004) (citing Stewart, 352 F.3d 422). Viewing the evidence in the light most favorable to Plaintiff, the record supports her contention that Israel removed her "responsibility for managing people, resources, finances, the budget, contracts, property, time

and attendance, technology operations, maintenance activities, and strategic planning." Opp. at 7. In fact, Defendant acknowledges that Plaintiff had "performed unit chief responsibilities" prior to the reorganization, Def.'s SUMF, ¶ 3, and that after the reorganization she was informed that she "would no longer have supervisory responsibilities." <u>Id.</u>, ¶ 16. And both Israel's and Goodwin's testimony are consistent with Plaintiff's allegations on this point. <u>See</u> Israel Dep. at 71-72; Opp., Exh. 15 (Dep. of Timothy Goodwin) at 29-31.

Defendant's only response to Plaintiff's argument that the reduction of her responsibilities constitutes an adverse employment action is to reemphasize the fact that her "official position (GS-15 Computer Scientist) remained unchanged." Reply at 9. While a "purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance," is not an adverse employment action, <u>Brown</u>, 199 F.3d at 456 (quoting <u>Ledergerber v. Stangler</u>, 122 F.3d 1142, 1144 (8th Cir. 1997)) (internal quotation marks omitted), the absence of a "demotion in form" does not preclude a finding that Plaintiff suffered a material reduction in duties "such that a reasonable trier of fact could conclude that [she] has suffered objectively tangible harm." <u>Id.</u> at 457; <u>see also</u> <u>Ohal</u>, 100 Fed. Appx. at 834-35 (explaining and elaborating upon <u>Brown</u>); <u>Pardo-Kronemann v. Donovan</u>, 601 F.3d 599, 607 (D.C. Cir. 2010) (same). It is not as if Plaintiff, moreover, was merely performing these duties on her own initiative; Plaintiff's supervisor advised her that she was a Unit Chief and tasked her with corresponding responsibilities. <u>See</u> Tanner Aff. at 3-4. Because a reasonable jury could find that Plaintiff was left with "significantly diminished responsibilities," <u>Pardo-Kronemann</u>, 601 F.3d at 607 (quoting <u>Czekalski v. Peters</u>, 475 F.3d 360, 365 (D.C. Cir. 2007)) (internal quotation marks omitted), Plaintiff has established an adverse employment action for the purpose of summary judgment.

The inquiry, however, does not end here. It is beyond dispute that Defendant has offered legitimate, nondiscriminatory reasons for reassigning Plaintiff's duties and supervisory responsibilities. First, Plaintiff did not in fact possess the title of "Unit Chief," and Israel realigned her responsibilities accordingly. <u>See</u> Reply at 6-7; Israel Dep. at 50-53. Second, the change in Plaintiff's duties occurred during a reorganization intended to consolidate two IT departments and reduce operating inefficiencies. Israel "believe[d] that [Plaintiff] (who claimed to have been informally the Unit Chief) shared at least some responsibility for any inefficiencies in that organization" and, based on a meeting with her prior to the reorganization, "formed the impression . . . that she would be resistant to any changes that might be proposed." Reply at 8; <u>see</u> Israel Aff. at 5-7. Third, Israel believed that Goodwin, who took on the duties Plaintiff had previously performed, was better qualified to perform them not only because he was already technically a Unit Chief (whereas Plaintiff was not), but also because he had already been working within the organization into which Plaintiff's department was being merged. <u>See</u> Reply at 9; Israel Aff. at 5-7. It was Israel's belief that Goodwin was the "best person available for the job." Israel Aff. at 5.

Because Defendant has asserted legitimate, nondiscriminatory reasons for reducing Plaintiff's responsibilities, the Court, following <u>Brady</u>, must determine whether Plaintiff has produced sufficient evidence for a reasonable jury to find that Defendant's stated reasons were mere pretexts for discrimination on the basis of race or sex. Plaintiff proffers several arguments in an attempt to show pretext. First, she asserts that Israel claimed he removed Plaintiff from the Unit Chief position because there was no available Unit Chief position, but that in fact there were available positions. <u>See</u> Opp. at 6. Plaintiff bases this allegation on a December 15, 2005, email in which Israel wrote to Tanner, "I have a UC [Unit Chief] position and can make her one

if she is not." Tanner Documents at 29. She provides no further evidence that a vacancy in fact existed. Defendant claims that Israel was mistaken when he made this statement, see Reply at 7 n.5, but even if there were a vacant Unit Chief position, Plaintiff does not contest that Israel would have had to advertise and compete it before she could have been promoted to that role. Whether or not a vacancy existed, moreover, is not material because it does not call into question the legitimacy of Defendant's nondiscriminatory explanations – Plaintiff was not in fact a Unit Chief, a reorganization to reduce inefficiencies in the unit was underway, and Goodwin was already a Unit Chief.

Second, she points to a dispute in the record about whether Plaintiff made a statement challenging Israel for bringing "three white guys to analyze FTTTF." Opp. at 7; compare Israel Aff. at 5-6 with Opp., Exh. 37 (Pl.'s Supp. Aff.), ¶ 12. Plaintiff suggests that Israel justified his decision to remove her supervisory responsibilities in part on this alleged statement. See Opp. at 7. While the record does evince a dispute about whether Plaintiff in fact made such a comment, Israel does not appear to identify the statement as a reason for his decision. See Israel Aff. at 5-6. Instead, he explains his decisions on the grounds previously discussed. The disputed fact, accordingly, is not a material one.

Third, she challenges Israel's claim that he removed Plaintiff's duties because he considered her to be part of the problem at FTTTF, but "testified that he did not know anything about Plaintiff prior to her coming under his supervision." Opp. at 7. Not only is Defendant's suggestion that Plaintiff may have "been part of the problem" merely secondary to the primary explanation for its employment decision – the fact that Plaintiff did not officially hold the position the responsibilities of which she was performing – but these two statements are also not necessarily contradictory. The change in Plaintiff's duties occurred during a reorganization

intended to reduce operating inefficiencies, and Israel believed that FTTTF had been operating inefficiently. See Israel Aff. at 5-7. It would certainly be reasonable to "believe that [Plaintiff] (who claimed to have been informally the Unit Chief) shared at least some responsibility for any inefficiencies in that organization." See Reply at 8; Israel Aff. at 5-7. In any event, Plaintiff does not dispute that Israel had met with her prior to the reorganization. See Pl.'s SUMF, ¶ 24.

Finally, she points out that Goodwin gave a statement identifying both his race and Plaintiff's and suggested that she might be biased against white males. Opp. at 8; id., Exh. 33 (Flanders Report). She also points to a statement by a coworker that Israel may have "had difficulty communicating with [Plaintiff] possibly because she is a strong and competent woman." Opp. at 8 (quoting Deguid Aff. at 7-8). The former statement, however, is irrelevant to the instant question. Not only did it occur in December 2006, nearly a year after Plaintiff's Unit Chief responsibilities were removed, see Flanders Report at 1, but it was also made by Goodwin, not the decisionmaker Israel. The latter is merely a coworker's suggestion and, in any event, appears to concern interactions between Plaintiff and Israel that took place after they actually began working together.

Plaintiff, therefore, has simply not provided sufficient evidence for a reasonable jury to find that Defendant's stated reasons were pretextual. The fact of the matter is that Plaintiff had never been officially promoted to the Unit Chief position; upon her employer's realization of this fact, her responsibilities were diminished accordingly. While Plaintiff disputes various aspects of the additional justifications Defendant has provided, she cannot dispute this central fact. Because no reasonable jury could find that Plaintiff's responsibilities were reduced because of race- or sex-based discrimination, this claim cannot survive summary judgment.

     *2. Discrimination and Retaliation in Removal of Program Manager Responsibilities*

Plaintiff next claims that Defendant discriminated and retaliated against her when it removed her Program Manager responsibilities for the Guardian and e-Guardian projects. See Opp. at 9. Defendant does not appear to contest that the removal of those responsibilities constituted an adverse employment action. As discussed above in Section III.A.1, *supra*, "a material reduction of supervisory responsibilities . . . can amount to an adverse employment action." Ohal, 100 Fed. Appx. at 834. Because a reasonable jury could find that removing Plaintiff from her role as Project Manager left her with "significantly diminished responsibilities," Pardo-Kronemann, 601 F.3d at 607 (quoting Czekalski, 475 F.3d at 365) (internal quotation marks omitted), she has established an adverse employment action for the purpose of summary judgment.

Defendant, however, has again provided a legitimate, nondiscriminatory explanation for removing her Project Manager responsibilities: Plaintiff was resistant to her superior's plans regarding the project and missed an important meeting. See Mot. at 19-20; Reply at 11-15. This explanation is supported by substantial and contemporaneous record evidence. In early 2007, Israel began investigating the possibility of using an existing commercial off-the-shelf (COTS) product to fulfill the role e-Guardian was being developed for. See Def.'s SUMF, ¶¶ 46, 48. Plaintiff disagreed with Israel's decision to pursue the possibility of using the COTS product. See Mot., Exh. Q to Parker Decl. (Harrington-Hutchinson Emails, March 6, 2007). On March 6, 2007, she emailed T.J. Harrington, a senior official who was the "customer" for the Guardian projects, Reply at 11, to voice her opposition: "Now Jack [Israel] wants to explore new technology tool solutions for e-Guardian. We are beyond this. We need to stay the course and get back on our path to develop e-Guardian if we want a release this year." Harrington-Hutchinson Emails, March 6, 2007. Harrington responded: "The Director has made it clear the

IT issue must be controlled by the [OCTO] so he can hold them accountable. If there is a COTS product that will speed our delivery, that would be great . . . . It never hurts to listen." Id.

Shortly thereafter, Israel asked Plaintiff to attend a meeting regarding a COTS product called SRA and to prepare evaluation criteria for the product. See Pl.'s Dep. at 102-07, 109; Mot., Exh. R to Parker Decl. (Israel-Hutchinson Emails, March 29, 2007). Plaintiff did not attend and instead took leave to participate in a volunteer project outside the office. See Pl.'s Dep. at 102-03. Plaintiff claimed that she did not believe that she needed to attend the meeting because she had seen the product previously and suggested that she had warned Israel in advance that she would not be attending. See Pl.'s Dep. at 102-03. Even if Plaintiff's memory was accurate, she does not deny that she had specifically been asked to attend the meeting. Id. at 103. An employer would certainly be justified in removing an employee's responsibilities for having missed a meeting concerning the very project she was managing and that she had specifically been asked to attend.

Israel's contemporaneous email to Plaintiff is consistent with this explanation:

> I'm under a lot of pressure from [Harrington] to deliver on eGuardian. I'm very concerned that you did not make the meeting on the . . . product when it was announced much in advance. I had asked you to prepare evaluation criteria for [the product] based on your experience with Guardian. After looking at the situation, I am asking Tim to put you on another task at FTTTF and find someone else to work eGuardian.

Israel-Hutchinson Emails, March 29, 2007; see also Pl.'s Dep. at 109-10. As is a roughly contemporaneous email from Harrington:

> [Plaintiff] is upset because her extensive efforts in building Guardian and e-Guardian are potentially in jeopardy because the [OCTO] has identified a COTS product which appears to have all and more benefits for our use. . . . . It appears [Plaintiff] is resisting this process. I was told that [Israel] requested her to be at the . . . briefings and she did not attend.

Mot., Exh. P to Parker Decl. (Harrington Email, April 9, 2007) at 1.

Plaintiff primarily attempts to demonstrate pretext by arguing that Defendant's asserted explanation has evolved over time. "Changes and inconsistencies in an employer's stated reasons for an adverse employment action can cast doubt on its asserted nondiscriminatory justification for the action." Farris v. Clinton, 602 F. Supp. 2d 74, 89 (D.D.C. 2009). In particular, she points to a portion of Israel's Deposition in which he testified that the "primary reason" he removed Hutchinson was Harrington's suggestion that "he wasn't happy with [her] performance on the eGuardian program." Israel Dep. at 66-67. On this point, she contrasts Harrington's contrary testimony that he was not unhappy with Plaintiff's performance, had not asked that she be removed, and had expressed concern when he learned she had been removed. See Harrington Dep. 85-86; Harrington Aff. at 8.

Even if Plaintiff has identified a factual dispute with regard to this secondary explanation for Israel's decision to remove her Program Manager responsibilities, it appears to be merely that – a secondary explanation. More important, this is not a situation where Defendant's position has evolved over time in litigation. On the contrary, Defendant's explanation concerning the missed meeting is entirely consistent with contemporaneous records and, standing alone, justifies the decision to remove Plaintiff's Program Manger responsibilities. But in any event, Harrington did in fact express concerns about Plaintiff's performance. In his email, he acknowledged that Plaintiff was "resisting [the] process" of exploring COTS alternatives, Harrington Email, April 9, 2007, and he stated in his affidavit that she "was at times resistant and stubborn with regards to accepting alterations to her approach or course of action" and that her "approach to the [OCTO] process combined with the manner in which she communicated her opposition to UC Goodwin and Jack Israel did not help the already tense situation." Harrington Aff. at 4, 8. While

Harrington may well have been satisfied with Plaintiff's performance overall, see Harrington Dep. 85-86; Harrington Aff. at 8, his contemporaneous email and subsequent testimony are not entirely uncritical.

In attempting to establish pretext for her retaliation claim, Plaintiff emphasizes the temporal proximity of her removal to the filing of her EEO complaint. Specifically, Plaintiff notes that the removal occurred "less than one month after she filed her EEO complaint and less than one week after Israel and Goodwin were apprised of [it]." Opp. at 11. "[P]ositive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." Woodruff v. Peters, 482 F.3d 521, 530 (D.C. Cir. 2007). Although the one-week gap might be suggestive in some circumstances, as Defendant points out, Israel was aware that Plaintiff had been involved in the EEO process involving her allegations of discrimination against him for more than a year. See Compl., ¶ 26 (noting that the EEO "mediation process . . . commenced" on February 6, 2006, and that Israel attended a mediation on April 30, 2006).

Ultimately, Plaintiff concedes that she missed a meeting she was asked by her supervisor to attend that concerned the project she was managing. Such a lapse can certainly justify an employer's decision to remove management responsibilities over that project. Contemporaneous emails by multiple sources confirm that Plaintiff was removed from the Project Manager role on these grounds. Because Plaintiff cannot provide sufficient evidence for a reasonable jury to conclude that this explanation was pretextual, this claim cannot survive summary judgment.

       3. *Retaliation in Filing Allegedly False Allegations that Resulted in an OPR Investigation*

Plaintiff's third claim is that Defendant retaliated against her for pursuing discrimination allegations with the EEO when "an anonymous individual filed a complaint against Plaintiff with the FBI's Inspection Division alleging that Plaintiff misused FBI letterhead and misrepresented

herself by using the title Unit Chief or Acting Section Chief in three written documents." Opp. at 12. This complaint resulted in the initiation of an internal investigation of Plaintiff's conduct on April 13, 2007. See id., Exh. 19 (OPR Documents) at 1.

An adverse action, "for purposes of a retaliation claim[,] is one that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Gaujacq v. EDF, Inc., 601 F.3d 565, 577 (D.C. Cir. 2010) (quoting Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). Plaintiff argues that "[a] false referral for investigation is an adverse action." Opp. at 12. As Defendant rightly points out, however, the allegations made against Plaintiffs were not false; in fact, they were confirmed by OPR's investigation to be true: "OPR conclude[d] Hutchinson violated FBI Policy and Offense Code 5.23 when writing the three letters." See Mot., Exh. D to Parker Decl. (OPR Adjudication Unit Addendum Re: Selena Hutchinson, July 17, 2007) at 10. And though it did not ultimately conclude that her use of the title "Unit Chief" or "Acting Section Chief" amounted to a violation of a provision of the Offense Code prohibiting "unprofessional conduct" because Tanner "had 'conferred' both titles on her," OPR concluded that she had "never [been] formally promoted to Unit Chief or Acting Section Chief and should not have used those titles." Id. No false referral thus occurred.

Even if the referral had been false, moreover, Plaintiff did not suffer any tangible detriment as a result of the investigation. OPR concluded that an oral reprimand would be the appropriate penalty for her violation, but Plaintiff does not even recall receiving one. See Pl.'s Dep. at 161. Though in her Complaint Plaintiff alleged that the investigation may have affected her ability obtain a particular promotion, see Compl., ¶ 52, Judge Huvelle noted previously that "[a] mere allegation that the investigation possibly resulted in Ms. Hutchinson's non-selection . . . is insufficient . . . at the summary judgment stage." Hutchinson, 668 F. Supp. 2d at 218. We have

now reached that stage, and Plaintiff has not provided evidence to support this allegation; indeed, Defendant has established that only the top three candidates for the position were subject to a background check and that Plaintiff was not among those candidates. See Walker Decl., ¶ 7. Plaintiff simply "offer[s] no evidence showing that the . . . investigation . . . affected her employment in any meaningful way." Halcomb v. Office of Senate Sergeant-at-Arms of U.S. Senate, 563 F. Supp. 2d 228, 246 (D.D.C. 2008). While in retaliation cases the question is more precisely whether the "prospect of such an investigation could dissuade a reasonable employee from making or supporting a charge of discrimination," Velikonja v. Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006) (emphasis added), no reasonable jury could find this to be the case here. Finally, even if it could, Plaintiff has offered no colorable evidence of pretext. The Court, consequently, finds that no issue of material fact exists that warrants proceeding to trial on this claim.

### 4. *Discrimination and Retaliation in Non-Selection for Unit Chief Position*

Plaintiff's fourth and final discrete claim is that Defendant discriminated and retaliated against her when it "refused to consider [her] for the vacant Unit Chief position" and hired Rick Chandler, a white male, instead. Opp. at 14. No one doubts that the failure to promote constitutes an adverse employment action. See, e.g., Stella v. Mineta, 284 F.3d 135, 146 (D.C. Cir. 2002) ("no question that failure to promote is an 'adverse action'"). It is similarly beyond dispute, however, that Defendant has offered legitimate, nondiscriminatory reasons for choosing to promote Chandler instead of Plaintiff. First, Defendant was concerned about Plaintiff's ability to fill the role for essentially the same reasons as it alleges motivated its decision to remove her Project Manager responsibilities. See Reply at 17-18. Second, Chandler already held a Unit Chief position (which meant that his transfer was a lateral one and Israel would not have to post

and compete the position before hiring him), was experienced handling contracts and finances, had good personnel-management skills, and was generally the best match for the position.  See Mot. at 15; Israel Dep. at 179-84.  The only remaining question, accordingly, is whether Plaintiff has "produced sufficient evidence for a reasonable jury to find that [Defendant's] asserted non-discriminatory reason" is mere pretext for unlawful discrimination or retaliation.  Brady, 520 F.3d at 494.

Where, as here, an employer's legitimate, nondiscriminatory reason "rel[ies] heavily on subjective considerations," the Court must treat it with caution.  Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1298 (D.C. Cir. 1998).  Plaintiff makes three arguments in support of her contention that Defendant's proffered explanation was pretextual.  First, she briefly argues that "[t]he temporal proximity of [her] EEO complaint and Israel's refusal to consider [her] for the position" is evidence of pretext.  Opp. at 17.  Plaintiff notes that "Israel's dismissal of Plaintiff's request to fill the position came only two months after he was notified about Plaintiff's EEO complaint," id., while Defendant points out that Chandler was not selected to fill the position until more than three months after Plaintiff filed her complaint.  Reply at 19, n.12.  While "[t]emporal proximity can indeed support an inference of causation . . . where the two events are 'very close' in time," Woodruff , 482 F.3d at 529 (quoting Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001)), our Circuit has held that "positive evidence beyond mere proximity is required to defeat the presumption that [an employer's] proffered explanations are genuine."  Id. at 530; Butler v. District of Columbia Housing Fin. Agency, 593 F. Supp. 2d 61, 67, n.13 (D.D.C. 2009) (employee "cannot rely on temporal proximity alone to establish pretext; he must point to additional evidence").  Even if the Court accepts Plaintiff's two-month measure,

therefore, "mere proximity" is not enough. See Taylor v. Solis, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (collecting cases).

Second, Plaintiff argues, citing a Fifth Circuit decision, that "Defendant cannot rely on Chandler's credentials as a legitimate non-discriminatory reason for not selecting Plaintiff" because "Israel did not begin to consider Chandler for the position until after he had rejected consideration of Plaintiff for the position." Opp. at 16. Plaintiff does not provide a citation to the record for her claim that Israel did not consider Chandler until after he had rejected Plaintiff. See id. Indeed, Israel testified that he "didn't consider her . . . because when this opportunity" – the opportunity to transfer Chandler into the position – "presented itself, [he] thought it was the best match." Israel Dep. at 183 (emphasis added). Even if Plaintiff were correct that Israel affirmatively decided not to promote Plaintiff before he began evaluating Chandler's qualifications, Defendant's proffered explanation for failing to promote her involved not only its belief that Chandler was better qualified for the job, but also its belief, based on prior incidents about which much evidence has been provided, that Plaintiff was not well suited for it. See, e.g., Israel Aff. at 12.

Plaintiff's third argument is really her central one: that her qualifications for the position were superior to Chandler's. Opp. at 15-17. Evidence that Plaintiff was better qualified, however, does not suffice to support an inference of discrimination or retaliation; rather, a jury must be able to find Plaintiff was "significantly better qualified for the job" than Chandler. Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006) (emphasis added). The difference must be "great enough to be inherently indicative of discrimination." Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007) (internal quotation marks omitted). Only then could a jury "legitimately infer that the employer consciously selected a less-qualified candidate -- something

that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." Id. (internal quotation marks omitted). "In a close case, a reasonable [fact-finder] would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." Aka, 156 F.3d at 1294.

In this case, a reasonable jury could not find that Plaintiff possessed the "stark superiority of credentials" over Chandler that can give rise to an inference of pretext. Stewart, 352 F.3d at 429. While Plaintiff had performed Unit Chief duties under a previous supervisor, she had never actually held the Unit Chief position. See Section III.A.1, *supra*. Chandler was already a Unit Chief working in another section of OCTO. See Israel Dep. at 180-81; Chandler Dep. at 11-12. Significantly, Chandler's status as a Unit Chief meant that Israel did not have to spend time advertising and competing the position before giving it to him. See Israel Dep. at 181; Opp., Exh. 36 (June 28, 2007 Personnel Action). While Plaintiff had received praise for some aspects of her performance, see, e.g., Pl.'s Opp., Exh. 31 (Aff. of Rhonda Lewis) at 3; id., Exh. 9 (Dep. of Gerald Rogero) at 18; id., Exh. 32 (Harrington Handwritten Notes); Tanner Aff. at 5; Loudermilk Dep. at 37, she readily admits that she had also recently been removed from her Project Manager position and received critical performance reviews from multiple supervisors. See, e.g., Pl.'s Resp. to Def.'s First Set of Interrogatories. Chandler, on the other hand, seems to have had an unblemished reputation, see Israel Dep. at 179-80, and Plaintiff points to no evidence tending to impeach his performance history in any respect.

Even with the benefit of all inferences from the evidentiary record, Plaintiff can demonstrate that, at best, she was only slightly more qualified for the Unit Chief position. Indeed, a reasonable jury would likely conclude that she was less so. There is, at bottom, no

question that the contrast between Plaintiff's and Chandler's qualifications for the Supervisor position was not "great enough to be inherently indicative of discrimination." Jackson, 496 F.3d at 707 (internal quotation marks omitted); see also Benjamin v. Duncan, 694 F. Supp. 2d 1, 7 (D.D.C. 2010) (deferring to employer's decision where decisionmaker believed selectee's prior work experience demonstrated his "communicati[on] and people skills" while decisionmaker and other employees believed plaintiff was difficult to work with); cf. Aka, 156 F.3d at 1296 (finding evidence of qualifications gap sufficient to defeat summary judgment where the plaintiff had 19 years of relevant work experience, while selectee had two months of volunteer experience).

Ultimately, the Court will defer to an employer's judgment absent a viable showing of pretext. As Plaintiff has failed to make such a showing, the Court concludes that there are no genuine issues of material fact that would warrant proceeding to trial on this claim.

   B.  Hostile Work Environment

Having addressed Plaintiff's discrete discrimination and retaliation claims, the Court now turns to the issue of hostile work environment. Title VII makes it unlawful for an employer to "requir[e] people to work in a discriminatorily hostile or abusive environment." Harris, 510 U.S. at 21 (1993). A hostile work environment can amount either to discrimination or retaliation under VII. See, e.g., Harris v. Wackenhut Servs., Inc., 419 Fed. Appx. 1, 1 (D.C. Cir. 2011) (discrimination); Singletary v. District of Columbia, 351 F.3d 519, 526 (D.C. Cir. 2003) (retaliation). In this case, Plaintiff has made both claims, alleging that she was subjected to a hostile work environment both because of race- and gender-based discrimination and in retaliation for her EEO activity. "To prevail on such a claim," Plaintiff must establish that she was "subjected . . . to 'discriminatory intimidation, ridicule, and insult" that a reasonable jury could find was "'sufficiently severe or pervasive to alter the conditions of [her] employment and

create an abusive working environment.'" <u>Baloch</u>, 550 F.3d at 1201 (quoting <u>Harris</u>, 510 U.S. at 21). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." <u>Id.</u> at 1201 (citing <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998)). "The Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" <u>George v. Leavitt</u>, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting <u>Faragher</u>, 524 U.S. at 788). By adhering to these standards, the Court thereby "ensure[s] that Title VII does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace." <u>Faragher</u>, 524 U.S. at 788 (citation and quotation marks omitted).

Defendant served an interrogatory on Plaintiff asking that she "[d]escribe in detail each and every instance on which you base your claim in the Complaint for discrimination based on a hostile working environment." Pl.'s Resp. to Def.'s First Set of Interrogatories at 3. Plaintiff acknowledges that, although it would be impossible to "accurately create a complete list of everything that happened to [her] in the creation of a hostile work environment," her answer to that interrogatory "is a good representation" of the events she remembered and believed comprised her claim. Pl.'s Dep. at 135-36. In addition to the conduct underlying her four discrete discrimination and retaliation claims analyzed in Section III.A, *supra*, Plaintiff identifies the following as having contributed to what she believed to have been a hostile work environment: 1) "demeaning" and "hostile" emails sent by Israel and Goodwin to her and to others; 2) critical performance ratings in both formal and informal contexts; 3) "hostile and inappropriate comments" made by Goodwin; 4) removal from her office and ultimate relocation "in unhealthy, undesirable seating space"; 5) the failure to recognize her contributions with

awards when those awards were merited and others were receiving them; 6) unequal treatment as compared to other employees at the GS-15 level in various respects; 7) failure to provide her with an opportunity to compete for various positions and opportunities; 8) failure to provide her with training others were provided with; 9) attempts to relocate her "to downtown" and place her on "less interesting and less visible projects"; 10) Goodwin's making false statements with regard to the OPR investigation; 11) his preparation of a Performance Improvement Plan for Plaintiff; and 12) various other related incidents. See Pl.'s Resp. to Def.'s First Set of Interrogatories at 3-7.

As a preliminary matter, it is noteworthy that Plaintiff was unaware of some of the conduct she now argues contributed to creating an "abusive working environment" – in particular, Goodwin's actions listed as the tenth and eleventh items in the preceding paragraph. See Pl.'s Dep. at 161-62; 167-68. The Supreme Court has expressly stated that "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." Harris, 510 U.S. at 21-22. Conduct that Plaintiff did not know about, therefore, cannot be used to establish that she was subjected to a hostile work environment. See Weger v. City of Ladue, 500 F.3d 710, 736 (8th Cir. 2007) ("Assuming plaintiffs were unaware of the incidents, they cannot be used to prove their substantive hostile work environment claims."); Burnett v. Tyco Corp., 203 F.3d 980, 981 (6th Cir. 2000) (holding that certain conduct was irrelevant to plaintiff's hostile work environment claim absent evidence that plaintiff was contemporaneously aware of it); Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 782 (10th Cir. 1995) (A plaintiff "may only rely on evidence relating to harassment of which she was aware during

the time that she was allegedly subject to a hostile work environment.").  Neither Goodwin's

actions nor the Performance Improvement Plan, therefore, may be considered.

With regard to the remaining incidents, even when viewed in the light most favorable to

Plaintiff, the record still cannot support a finding that Defendant subjected Plaintiff to conduct

"sufficiently severe or pervasive to alter the conditions of [her] employment and create an

abusive working environment."  Harris, 510 U.S. at 21 (quoting Meritor Savings Bank, FSB v.

Vinson, 447 U.S. 57, 67 (1986)) (internal quotation marks omitted).  While the Court must

consider the circumstances as a whole, see id. at 23, a few observations on Plaintiff's specific

allegations are warranted.  Allegedly insulting emails sent over a period of years "are the sort of

isolated acts that courts have consistently rejected as the basis for Title VII claims."  Roof v.

Howard Univ., 51 F. Supp. 2d 108, 113-14 (D.D.C. 2007), aff'd, 2008 U.S. App. LEXIS 2891

(D.C. Cir. 2008).  In addition, negative performance reviews – even if inaccurate, as Plaintiff

claims – are not strong indicia of a hostile work environment.  "[U]ntimely and low performance

ratings . . . do not by themselves sustain a hostile work environment claim because these

incidents are not severe as a matter of law."  Nai'im v. Rice, 577 F. Supp. 2d 361, 377 (D.D.C.

2008) (collecting cases); see also Wada v. Tomlinson, 517 F. Supp. 2d 148, 211-12 (D.D.C.

2007), aff'd, 2008 U.S. App. LEXIS 2526 (D.C. Cir. 2008).  Both the emails and the reviews that

Plaintiff found objectionable, moreover, concerned Platiniff's performance.  "Criticisms of a

subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the

kinds of normal strains that can occur in any office setting . . . .  [T]hey do not demonstrate a

work environment that was pervaded by discrimination."  Singh v. U.S. House of

Representatives, 300 F. Supp. 2d 48, 56 (D.D.C. 2004).

Plaintiff was only able to identify two verbal comments that she considered to have reflected a hostile work environment. See Pl.'s Dep. at 144-47; 179-80. On the first occasion, "Goodwin asked Plaintiff about the contents of a Dell computer box, which was clearly marked. When she did not immediately respond, Mr. Goodwin snidely said: 'Are you so dumb that you do not know what is in the box.'" Compl., ¶ 33. On the second, Goodwin "told her that she had better have a good explanation for" having ordered some equipment for one of her projects. Id. While Plaintiff may have found such comments displeasing, they do not approach the level necessary to support a hostile-work-environment claim. See, e.g., Hernandez v. Gutierrez, 656 F. Supp. 2d 101, 106 n.6 (D.D.C. 2009) (no hostile work environment where "one co-worker frequently touched his private parts in front of her, told her his marriage was not the same as it used to be, talked to her about humans and animals having sex, showed her sexually explicit pictures, and told her that a paperclip could be used as a weapon and then . . . put a fist close to her face." (internal quotation marks and citations omitted)); Taylor v. Chao, 516 F. Supp. 2d 128, 136-47 (D.D.C. 2007) (no hostile work environment where coworkers "asked if [Plaintiff's] hair were 'red all over,'" called her 'sweetie' and 'baby,' and offered to "beat up her fiancé"); Bryant v. Brownlee, 265 F. Supp. 2d 52, 64 (D.D.C. 2003) (no hostile work environment where co-worker referred to plaintiff as "nigger" and another co-worker said "black woman were at the bottom. The white men were first, the white women were right up there with them . . . .").

Nor are Plaintiff's other complaints indicative of a hostile work environment. "[A]llegations about the actions that [Plaintiff] claims undermined [her] authority within the FBI . . . and cut [her] out of the chain of command are . . . insufficient to support a hostile work environment claim." Rattigan v. Gonzales, 503 F. Supp. 2d 56, 80 (D.D.C. 2007). "Nor can the denial of important assignments . . . . be characterized as sufficiently intimidating or offensive in

an ordinary workplace context." Johnson v. District of Columbia, 572 F. Supp. 2d 94, 109 (D.D.C. 2008). A hostile-work-environment claim is simply not a cause of action for the "ordinary tribulations of the workplace." Franklin v. Potter, 600 F. Supp. 2d 38, 76-78 (D.D.C. 2009) (quoting Faragher, 524 U.S. at 788); see also Baloch, 550 F.3d at 1201 (Plaintiff's "claims of harm are not supported by evidence of tangible workplace consequences, whether financial, physical, or professional. His allegations of insult are undercut by the legitimate reasons and constructive criticism . . . . His claims of public humiliation do not match the evidence. And his assertion of pervasive and constant abuse is undermined by the sporadic nature of the conflicts.").

Even if Plaintiff were able to establish a jury question as to the existence of a hostile work environment, moreover, she has not provided evidence establishing a causal connection between that environment and her race, sex, or protected activity. See Na'im v. Clinton, 626 F. Supp. 2d 63, 73 (D.D.C. 2009) ("[H]ostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class."). Though harassment need not possess overt discriminatory overtones in order to constitute a hostile work environment, see McKinney v. Dole, 765 F.2d 1129, 1138 (D.C. Cir. 1985), not a single one of the items Plaintiff identified in response to Defendant's interrogatory as being part of her hostile-work-environment claim related to race or sex. See Baloch, 550 F.3d at 1201("[N]one of the comments or actions directed at [Plaintiff] expressly focused on his race, religion, age, or disability – unlike in some hostile work environment cases."); Harris, 419 Fed. Appx. at 1-2 ("Harris points to only three racially motivated comments directed at him during a one-year period."). Plaintiff notes that a coworker suggested that Israel may have "had difficulty communicating with [Plaintiff] possibly

because she is a strong and competent woman." Deguid Aff. at 7-8. Someone's speculation that Israel "possibly" had issues with Plaintiff's sex is certainly not enough to clear the summary-judgment bar.

Plaintiff clearly had difficulties with several of her supervisors, and she may well have believed her working conditions to be less than ideal. No reasonable jury could find, however, that the harassment Plaintiff alleges was "'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment,'" Baloch, 550 F.3d at 1201 (quoting Harris, 510 U.S. at 21), or that such harassment was the result of discrimination or retaliation. The Court, accordingly, will grant Defendant's Motion for Summary Judgment on this claim.

## IV.  Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment. A separate Order consistent with this Opinion will be issued this day.


**SO ORDERED**.


                                        /s/ James E. Boasberg
                                        JAMES E. BOASBERG
                                        United States District Judge

Date:  October 3, 2011